UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| ROGER RAY JOHNSON, | ) | |
|---|---|---|
| | ) | Case No. 1:17-cv-102 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Susan K. Lee |
| ARDENT MILLS, LLC, | ) | |
| | ) | |
| *Defendant*. | ) | |

# MEMORANDUM OPINION

Before the Court is Defendant Ardent Mills, LLC's ("Ardent Mills") motion for summary judgment (Doc. 52). For the following reasons, Ardent Mills's motion will be **GRANTED**, and Plaintiff's claims will be **DISMISSED WITH PREJUDICE**.

## I. FACTUAL BACKGROUND[1]

The following facts are undisputed unless noted otherwise.

### A. Roger Ray Johnson's Position at Ardent Mills

Plaintiff Roger Ray Johnson is a fifty-nine-year-old African-American male with a dark complexion who was born in Jamaica and speaks with a noticeable accent. (Doc. 53-2, at 71, 130.) This action arises out of the decision of his former employer, Defendant Ardent Mills, to

---

[1] The record includes Roger Ray Johnson's affidavit, which was not filed with the Court until December 22, 2018, when it was attached to his untimely response to Ardent Mills's motion for summary judgment. (Doc. 54-2.) The Court notes that the signature page on Johnson's affidavit certifies that it was "sworn to and subscribed" before a notary on October 5, 2016. (Doc. 54-2, at 3.) This signature page dated October 5, 2016, appears to be an exact copy of the signature page Plaintiff appended to his EEOC complaint. (*Compare* Doc. 25-4, at 19, *with* Doc. 54-2, at 3.) Setting aside these issues, the statements contained in the affidavit do not create a genuine dispute about a material fact.

reassign him to another position, followed by his resignation. Johnson previously worked as a production supervisor for elevator operations for Horizon Mills, a company that processes wheat into flour. (*Id.* at 34.) In 2014, Horizon Mills merged with Con-Agra to become Ardent Mills. After the merger, Johnson continued working for Ardent Mills until about July 25, 2016, when he resigned. (*Id.* at 1–2, 28.) Johnson's responsibilities included "day-to-day operation, from bringing in inventory . . . unloading, project management, safety, . . . making sure all the data [got] entered into [the] labs system." (*Id.* at 30.) One of Johnson's safety-related duties was tracking inventory to ensure safe levels of vomitoxin, a fungus that infects wheat. (*Id.* at 6–7, 34–35; Doc. 54-1, at 23–24.)

After the merger, Eric McDaniel, former Quality Manager at the Chattanooga facility and a coworker or "peer" of Johnson, "always made sure that everything he shipped out met the [FDA] standard for vomitoxin levels" (Doc. 54-1, at 9, 38, 86); nonetheless, McDaniel became concerned that Ardent Mills's new policy requiring "high use of opportunity wheat" could result in consumers becoming sick, so he complained to Chattanooga Plant Manager Donald Halling about the policy. (*Id.* at 61–63, 72–73, 76–77, 80, 86.) Ardent Mills later terminated McDaniel, McDaniel believes, in part because he expressed disagreement with Ardent Mills's vomitoxin policy. (*Id.* at 85.) McDaniel testified that he had no knowledge of the decision to remove Johnson from his supervisor position and, at that time, he had already ceased working for Ardent Mills. (*Id.* at 86–87.) There is no evidence in the record that Johnson ever made any statements, to anyone, about vomitoxin levels or other safety concerns.

Johnson was "the only black supervisor here in Chattanooga," and one of "only five or six black males in the plant," causing him to "feel pressured." (*Id.* at 78.) He averred that "[e]very little thing that is not dotted, you know, I'm picked on." (*Id.*) Halling and others in

2

upper management would go to lunch with "[t]he other supervisors across the plant" but would only invite Johnson to lunch sometimes, when he was present in the area. At lunch they would "talk about safety, business, and stuff." (*Id.* at 73–74.) Godfrey Friedt was the only person in upper management that "[came] to [Johnson's] office and sat around and talked to [him]." (*Id.* at 73.) Johnson stated that, when he discussed database issues in meetings, "[t]hey look at as, you know, you don't know what you're doing[,]" due to his age. (*Id.* at 84.)

In addition, Johnson testified that Halling felt like he did "not communicat[e] proper[ly]" because of his Jamaican accent. (*Id.* at 73, 76–77.) McDaniel testified that "there might have been comments made about the dialect and maybe being hard to understand at times. . . . But that was just, you know—there was just a little bit of a language barrier there that I can remember, you know, that being an issue sometimes." (Doc. 54-1, at 94.) McDaniel did not remember any specific instances of such comments or who might have made them. (*Id.*)

### B. Events Leading Up to Johnson's Resignation

On May 27, 2016, Johnson participated in a telephone conference with Randy Garvert, Ardent Mills East Operation Manager, and Sara Ballou, a Grain Source Merchant responsible for Chattanooga. They discussed plans for rail unloading and associated data management over the upcoming Memorial Day weekend. (Doc. 53-2, at 4, 21–24, 50–57.) Garvert and Ballou communicated concern about "the need to unload" the railcars, and Johnson stated that there was no space to do so. (*Id.* at 22, 24, 53–57.) Ultimately, the railcars were not unloaded over the Memorial Day weekend, costing Ardent Mills more money than if it had paid workers overtime to work over the weekend. (*Id.* at 4–5, 52–57.)

Johnson avers that, after the telephone conference, he spoke with Mike Miller, Vice President of Risk Management, about Ballou. (*Id.* at 47, 89.) Specifically, Johnson "went over

3

all the capability or capacity at the elevator with Mike and also talked to him about Sara Ballou, that she is responsible for the hard wheat coming into Chattanooga." (*Id.* at 47.) Johnson also stated that he told Miller about Ballou's "attitude, and don't answer an email, don't answer a telephone call. If she do answer email, it's demeaning and demoralizing." (*Id.*) Johnson did not speak with Miller again and does not know if Miller "ever addressed" his comments about Ballou. (*Id.* at 48.)

On June 24, 2016, Halling issued Johnson a Performance Disciplinary Document. (*Id.* at 62–63, 215–16.) The document listed the following "concerns" regarding Johnson's performance:

> You are required to own the Elevator Database and be able to communicate affectively [sic] the data that is entered and the results of any movements. . . . In the past couple months there has been much conversation as to the accuracy of the numbers in the database and what is or isn't usable space. You were required to accurately account for bins that could be used and work with Godfrey Friedt early on in the year to make sure this databased accurately represented the Chattanooga Elevator. It has been communicated on many occasions from myself and Godfrey that you needed to use all the space that you have available and as the Elevator Manager it is your responsibility to manage every usable bushel of space in order to maximize operational efficiency and profitability. You have been reluctant to use smaller bins because they present more challenges to manage. It is your job to overcome these challenges . . . .
>        . . . .
> - You were asked back in March to put together the CPR/AED class. . . . You failed to schedule the classes to date and as of now we do not have anyone certified to use the three AEDs we have on site. This goes against our safety value.
> - You were given permission to pristine the Elevator breakroom . . . back in April and nothing has been accomplished on this project either. . . .
> - I asked that you purchase a shed . . . and I ended up purchasing the shed . . . because you had waited until the last minute.

(*Id.* at 215–16; *see also* 64–65.) The Performance Disciplinary Document also stated that "[f]ailure to achieve sustainable performance improvement may result in . . . termination of employment." (*Id.* at 216.) Johnson signed the Performance Disciplinary Document, but, below

4

his signature, he wrote, "I strongly disagree with this." (*Id.* at 216.) Johnson testified that he had more to write, but Halling "stopped me, and said, oh, something is wrong with what was written. I will get back to you. And he didn't get back with me, so he didn't let me finish my response." (*Id.* at 59.)

On or about July 11, 2016, the Ardent Mills facility in Macon discovered a peanut contamination in a railcar that had been loaded with wheat at the Chattanooga facility; the railcar had a "pungent peanut smell[,]" and there was "peanut skin" mixed in with the wheat. (*Id.* at 61, 205–14.) Johnson testified that he was not ultimately responsible for the contamination. (*Id.* at 61.) Although he testified that his duties included inspecting railcars for contamination, he also stated:

> We are not equipped to completely clean a car. When I say completely clean a car, we look inside a car. If we see any peanut in there, we get it out. That don't mean that the car is not—is clean. . . . You know, it's an industrial whole problem, not only my problem. But, yes, you know, we do inspect the car. Some hidden areas in the car that you cannot see.

(*Id.*) On July 18, 2016, Ardent Mills sent a letter to its suppliers informing them that Ardent Mills had "increased [its] review of transportation practices" after the peanut-contamination incident. (*Id.* at 214.)

### C. Johnson's Resignation

Garvert and Nile Somerville, Director of Human Resources, decided to remove Johnson from his supervisory position after "[t]he peanut contamination incident, in addition to the inventory issue, lack of initiative, and other issues identified in Johnson's Performance Disciplinary Document, caused [them, together with Lane Marte, Eastern Region Operations Manager], to conclude that [Johnson] was not meeting expectations and could not satisfactorily

5

perform his job duties."[2] (*Id.* at 6, 219.)  Johnson disputes Ardent Mills's proffered reasons for removing him from his supervisory position.  When asked what he did that caused Ardent Mills to retaliate against him, Johnson testified:  "By me complaining to Mike Miller about Sara Ballou.  Sara is a Caucasian female, and Randy didn't like it.  That's why Randy and Sara called me to pressure me to unload rail cars, and when I didn't do it, he retaliated." (*Id.* at 89.)  Johnson then clarified that his complaints about Ballou were the "main reason" Ardent Mills decided to remove him from his supervisory position.  (*Id.*)  However, Garvert and Somerville testified that they were unaware of the comments Johnson made to Miller about Ballou until after this lawsuit was filed.  (*Id.* at 6, 219.)

On July 22, 2016, Halling met with Johnson in person, with Somerville present by telephone.  (*Id.* at 6, 66–68, 218.)  Halling offered Johnson the choice of transferring to a non-supervisory position or resigning.  (*Id.*)  Halling did not specify the title, pay, and hours for the alternative position, and Johnson did not ask any questions about those details.  (*Id.* at 6, 67–68, 218.)  On July 25, 2016, Johnson told Halling he had decided to resign.  (*Id.* at 69.)

Johnson testified that he felt he was "weed[ed] out" because of his age, stating, "I'm a liability instead of an asset. . . .  You know, the older you get, the more liability you become, where—you know, you become more unhealthy." (*Id.*)  He also averred that Ardent Mills was "trying to get rid of salaried, high-paid people, you know, bring in the younger blood. . . . [M]y replacement was a young 23-year-old white male."[3]  (*Id.* at 87.)

---

[2] In Johnson's response, he states, "It is a disputed fact that [Garvert and Somerville] made the decision to offer Johnson a new position."  (Doc. 54-3, at 3.)  This statement is unaccompanied by a citation to the record.  (*Id.*)

[3] Johnson has presented no evidence of his replacement's rate of pay.

6

At some point, Ballou was transferred to Minnesota, to the "feed department." (*Id.* at 91–92.) Johnson interpreted Ballou's transfer as a demotion, but there is no additional evidence about the transfer in the record. (*Id.* at 91.)

## II. PROCEDURAL HISTORY

Johnson filed his complaint against Ardent Mills and Halling on March 17, 2017, in the Circuit Court for Hamilton County, Tennessee. (Doc. 1-1.) Ardent Mills removed the action to this Court on April 18, 2017. (Doc. 1.) On October 15, 2018, Johnson filed an amended complaint asserting the following claims against Ardent Mills: (1) disparate treatment based on sex, race, and national-origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; (2) retaliation;[4] (3) age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*;[5] and (4) retaliatory discharge under the Tennessee Public Protection Act ("TPPA"), Tennessee Code Ann. § 50-1-304.[6] (Doc. 50.) On November 21, 2018, Ardent Mills filed its renewed motion for summary

---

[4] Johnson's amended complaint does not state the legal authority for this claim, but it is presumably brought under Title VII. (Doc. 50, at 11–13.)

[5] Johnson's amended complaint lists the third claim as age discrimination under Title VII, but Ardent Mills's motion for summary judgment explicitly assumed Johnson seeks to bring this claim under the ADEA. (Doc. 53, at 13 n.4.) Although the complaint has not been amended to reflect that Johnson brings this claim under the ADEA, Johnson stated this in his response to Ardent Mills's motion for summary judgment. (Doc. 54-3, at 14.)

[6] Ardent Mills notes that Johnson makes an isolated reference to "hostile work environment" in his amended complaint. (Doc. 53, at 11 n.2; *see* Doc. 50, at 4.) Specifically, Johnson states that, "[a]fter [Johnson] engaged in protected activity by reporting hostile work conditions, [he] received a written performance warning, and shortly thereafter his employment was terminated." (Doc. 50, at 4.) Ardent Mills argues that "[n]othing in Plaintiff's Charge, Complaint, Amended Complaint, or deposition testimony suggests that Plaintiff has asserted a hostile work environment claim. Moreover, Plaintiff has not alleged any facts supporting such a claim." (Doc. 53, at 11 n.2 (citation omitted).) Johnson did not respond to Ardent Mills's argument on this theory. (*See generally* Doc. 54-2.) Therefore, the Court construes Johnson's isolated reference to "hostile work environment" as support for his retaliation claim, not an independent claim.

7

judgment (Doc. 52). Johnson filed an untimely response on December 22, 2018. (Doc. 54.) Ardent Mills's motion for summary judgment is now ripe for the Court's review.

## II. STANDARD OF LAW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden to inform the court of the basis for its motion to identify the portions of the evidence in the record that demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by

---

However, to the extent Johnson does seek to bring a hostile-work-environment claim, he has failed "to make a showing sufficient to establish" the elements to survive summary judgment. *Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002). To prevail on a claim of hostile work environment, a plaintiff must show: (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was based upon his protected status or protected activity; (4) the harassment affected a term, condition, or privilege of his employment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *Randolph v. Oh. Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006); *Downs v. Postmaster General*, 31 F. App'x 848, 850 (6th Cir. 2002). A hostile work environment is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "[O]ffhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* at 733 (quoting *Farragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Johnson has presented no evidence of specific instances of "intimidating, ridicule, or insult," let alone pervasive harassment. *Id.* Even if failing to invite him to lunch with the other supervisors (Doc. 53-2, at 73–77) were harassment, Johnson has not shown, beyond mere conjecture, that he was left out based on his protected status. *Randolph*, 453 F.3d at 733.

pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). At this stage, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, that party must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).

When ruling on a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. et al. v. Zenith Radio Corp.*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc. v. Eliadis, Inc*., 253 F.3d 900, 907 (6th Cir. 2001). The Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson*, 477 U.S. at 248–49. "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Policastro*, 297 F.3d at 538 (quoting *Celotex*, 477 U.S. at 322). A "mere scintilla" of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

## III. ANALYSIS

Ardent Mills seeks summary judgment on all of Johnson's claims. Despite the untimeliness of Johnson's response to Ardent Mills's motion, the Court will exercise its discretion to consider Johnson's response.

Johnson's response mainly lists facts he asserts are disputed, but the response neither explains why these facts are material nor provides the Court with adequate citations to the record. (*See generally* Doc. 54.)[7] Nonetheless, the Court must still consider whether Ardent Mills has met its burden to show there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991).

### A. Title VII and ADEA Discrimination[8]

Title VII makes it unlawful for an employer to discriminate on the basis of, *inter alia*, sex, race, or national origin. 42 U.S.C. § 2000e-2(a). The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to the compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Discrimination claims brought pursuant to Title VII and the ADEA are analyzed under the same framework. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). For

---

[7] "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991); *accord Jones v. Blanchard*, No. 92-3719, 1993 WL 272432, at *3 (6th Cir. July 16, 1993) ("[P]laintiff makes no attempt in his brief to engage in an in-depth factual analysis to bolster his [position]. Rather, plaintiff cursorily refers to the record and leaves it for us to ferret out the details to support his contentions.").

[8] Ardent Mills asks the Court to dismiss Johnson's race- and sex-discrimination claims for failure to exhaust his administrative remedies. (Doc. 53, at 12); *see* 42 U.S.C. § 2000e–5(e), (f); *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 507–08 (6th Cir. 2011) ("Before a plaintiff may sue under Title VII in federal court, [he] must first exhaust [his] administrative remedies, one component of which is timely filing a 'charge' with the EEOC." Because the Court will dismiss these claims on their merits, it is unnecessary to rule on Ardent Mills's failure-to-exhaust defense.

claims based on circumstantial evidence only, a plaintiff must proffer circumstantial evidence sufficient to allow an inference of discriminatory treatment under the *McConnell Douglas* burden-shifting framework. *Anthony v. BTR Automotive Sealing Sys.*, 339 F.3d 506, 514 (6th Cir. 2003) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). Because Johnson's response to the summary-judgment motion does not argue that he has presented direct evidence of discrimination, and the Court finds no direct evidence in the record, it is appropriate to utilize the *McDonnell Douglas* framework. *See id.*

The *McDonnell Douglas* framework requires a plaintiff first to establish a *prima facie* case of discrimination. 411 U.S. at 802. To do so, a plaintiff must show (1) "that he is a member of a protected group," (2) "that he was subject to an adverse employment decision," (3) "that he was qualified for the position," and (4) "that he was replaced by a person outside of the protected class." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 349 (6th Cir. 1997) (citing *Mitchell,* 964 F.2d at 582). The fourth prong can also be established by showing that a similarly situated employee outside of the protected class was treated more favorably. *Moore v. AMPAC*, 645 F. App'x 495, 498 (6th Cir. 2016). Similarly situated individuals are those who "have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell,* 964 F.2d at 583.

If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to come forward with a non-discriminatory reason for an adverse employment action or, in the disparate-treatment context, for treating the plaintiff differently from similarly situated employees. *Id.* at 584. If the employer does so, the burden shifts back to the plaintiff to show that the employer's

reason was pretext for discrimination and to "produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Id.*

Ardent Mills argues Johnson fails to make a *prima facie* showing of an adverse employment action and cannot, therefore, satisfy *McDonnell Douglas*'s second prong. "An adverse employment action is a "materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (emphasis omitted). Although "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions[,]" *Yates v. Avco Corp.*, 819 F.2d 630, 638 (6th Cir. 1987), such a reassignment "may be an adverse employment action if it constitutes a demotion evidenced by a 'less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004), *aff'd sub nom. Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

The removal of a "supervisor" designation, without more, is not an adverse employment action. In *Kocsis*, the Sixth Circuit affirmed a district court's grant of summary judgment, holding that a registered nurse who was reassigned from "nursing supervisor" to "unit RN" had not suffered an adverse employment action. 97 F.3d at 885–87. The Sixth Circuit found that Kocsis had not demonstrated that her reassignment was "materially adverse":

> In her new job as unit RN, [Kocsis] enjoyed the same (or a greater) rate of pay and benefits, and her duties were not materially modified. She submitted no evidence that she lost any prestige in her position because of her working conditions or her title change. Also, Kocsis failed to make a real attempt to compare the two positions before she filed her discrimination claim. Her immediate challenge of the transfer as a reflection of disability discrimination was premature. We agree with those courts who have required such a plaintiff to demonstrate as part of a *prima facie* case a showing of materially adverse

> conditions imposed by the employer. In our opinion, plaintiff has failed to make
> out such a case in her demotion claim, and summary judgment was appropriate
> for defendant on that basis.

*Id.*

Here, the Court only knows that Ardent Mills planned to move Johnson from the position of "Production Supervisor" to a "non-supervisory" position, presumably with a corresponding change in title. (Doc. 53-2, at 6, 66–67, 218.) But there is no evidence of what the new title would have been or whether Johnson's duties would have materially changed. Johnson points to no evidence that the title would have been "less distinguished." *Deleon*, 739 F.3d at 918. Nor does Johnson point to evidence of any other indices of a demotion. *See id.* Like the plaintiff in *Kocsis*, Johnson failed to "make a real attempt to compare the positions" before he resigned. *See id.* Johnson did not know the title or pay of the new position, and he asked no questions about it before resigning. (Doc. 53-2, at 66–67.) Despite viewing the record in the light most favorable to the nonmoving party, there is not sufficient evidence from which a jury could reasonably find that Johnson experienced an adverse employment action. *See Matsushita*, 475 U.S. at 587; *Anderson*, 477 U.S. at 248–49. Because Johnson has not shown that he suffered an adverse employment action, he has not established a *prima facie* case of employment discrimination under Title VII or the ADEA.

Even if Johnson had established a *prima facie* case, he has not presented sufficient evidence for a reasonable jury to find that Ardent Mills's stated reasons for firing him were a pretext for unlawful discrimination. Ardent Mills presented evidence that, even before the Performance Disciplinary Document he received in June, Johnson was characterized as an "inconsistent performer" in his 2015 and 2016 reviews. (Doc. 53-2, at 4, 14–18, 221–25, 218.) Garvert testified that the reasons for reassigning Johnson were the peanut-contamination

13

incident, the inventory issues, his lack of initiative, and other issues laid out in the June Performance Disciplinary Document. (*Id.* at 6.)

The plaintiff can show that an employer's stated reason for an adverse employment action is pretext for discrimination by providing evidence that: (1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate the employer's action, or (3) they were insufficient to motivate the employer's decision. *Chen v. Dow Chemical Corp.*, 580 F.3d 394, 400 (6th Cir. 2009) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)). "Mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471 (6th Cir. 2002).

In his response to Ardent Mills's motion for summary judgment, Johnson states he can "raise an inference of [pretext] by pointing to evidence that the employer's proffered reason was never used in the past to discharge an employee." (Doc. 54-3, at 18 (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 806–07 (6th Cir. 1998)).) Johnson further asserts that Ardent Mills's "proffered reasons are suspect because each stated basis for termination must have independently caused [Ardent Mills] to take the action when it did." (*Id.*)

Despite these assertions, Johnson has presented no evidence to show that Ardent Mills's stated reasons had no basis in fact, did not actually motivate the decision to reassign him, or were insufficient to motivate the decision. *See Chen*, 580 F.3d at 400. Johnson does not believe all of Ardent Mills's stated reasons were his fault, but he does not contest that there were inventory issues or that the railcar was contaminated. (Doc. 53-2, at 42, 61.) Thus, he has not shown that the proffered reasons had no basis in fact.

Johnson's conjectures that Ardent Mills may have discriminated against him are insufficient to show that Ardent Mills's proffered reasons did not actually motivate the decision to reassign him. When asked if he believed the decision to reassign him was based on his national origin, Johnson responded, "It could be—it could be." (Doc. 53-2, at 76.) When asked if he was discriminated against because of his race, Johnson testified that he believed his race was one of the reasons he was removed from his position, but the only reason he gave for believing so was that he was "the only black supervisor here in Chattanooga," and one of "only five or six black males in the plant," causing him to "feel pressured." (*Id.* at 78.) When asked if he was discriminated against because of his sex, Johnson testified, "No." (*Id.* at 82.) When asked if he was discriminated against because of his age, Johnson stated that, when he pointed out database issues, "they look at as, you know, you don't know what you're doing," but Johnson has presented no evidence—only conjecture—that such assessments of his database-management skills had anything to do with his age. (*Id.* at 84.) When pressed for any other reasons why he felt discriminated against on the basis of his age, he stated, "I'm a liability instead of an asset. . . . You know, the older you get, the more liability you become, where—you know, you become more unhealthy." (*Id.*) He added, "Because the weeding out, you know, trying to get rid of salaried, high-paid people, you know, bring in the younger blood. . . . [M]y replacement was a young 23-year-old white male." (*Id.* at 87.) This testimony is, however, nothing more than "mere conjecture" that Ardent Mills's proffered reasons did not actually motivate the decision to reassign him and, therefore, does not create a genuine issue of material fact. *See Peters*, 285 F.3d at 471.

Finally, Johnson has not shown that Ardent Mills's proffered reasons were insufficient to motivate the decision to reassign him. Although there is no evidence that any other employee

was reassigned for the exact same reasons as Johnson was, Johnson has not shown that another similarly situated employee engaged in the same conduct but was treated more favorably.

In sum, Ardent Mills has satisfied its burden of showing there is no genuine issue of material fact, and Johnson has failed to demonstrate that he suffered an adverse employment action. Even assuming Johnson did suffer an adverse employment action, he also fails to demonstrate that Ardent Mills's proffered legitimate, nondiscriminatory reason for reassigning him to a nonsupervisory position was pretext for discrimination. Accordingly, Ardent Mills is entitled to summary judgment on Johnson's claims of discrimination under Title VII and the ADEA.

### B. Title VII Retaliation

The *McDonnell Douglas* burden-shifting framework also applies to Title VII retaliation claim based on circumstantial evidence. *Kessler v. Riccardi*, 363 F. App'x 350, 355 (6th Cir. 2010). The Title VII antiretaliation provision makes it unlawful "for an employer to discriminate against any of his employees . . . (1) because he has opposed any practice made an unlawful employment practice by this subchapter, or (2) because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a); *Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 274 (2009). The first clause is known as the "opposition clause," and the second as the "participation clause." *Id.* In this case, the participation clause does not apply, because Johnson's alleged protected activity occurred before his EEOC complaint; only the opposition clause potentially applies. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (stating that any activity by the employee prior to the instigation of statutory proceedings is considered pursuant to the opposition clause).

"Under the opposition clause, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of [Title VII].” *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). Generally, "opposition" encompasses "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer—*e.g.,* former employers, union, and co-workers." *Niswander v. Cincinnati Ins. Co.,* 529 F.3d 714, 721 (6th Cir. 2008) (internal citations and quotation marks omitted). However, general work-related grievances that are not related to discrimination cannot be the basis of a retaliation claim under Title VII. *Willoughby v. Allstate Ins. Co.*, 104 F. App'x 528, 531 (6th Cir. 2004).

To establish a prima *facie* case based on retaliation, a plaintiff must establish that: (1) he engaged in protected activity; (2) the decisionmaker was aware of such protected activity; (3) an adverse employment action was subsequently taken against Plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Kessler*, 363 F. App'x at 355.

Ardent Mills first argues that Johnson fails to establish a *prima facie* case because there is no evidence he engaged in protected activity. (Doc. 53, at 20.) Johnson believes he was removed from his supervisory position in retaliation for his complaints about Ballou. (Doc. 53-2, at 77 ("After I make a complaint to Mike Miller about Ballou, that's when I receive a call, asking me what happened to me. . . . He said, be careful or watch yourself, something coming down the pipe."); *see also* 89–91.) Johnson's description of his complaints about Ballou show that the complaints were related to his perception that she was uncooperative in solving shipping problems: "Earlier I told you about 120 cars arrived with no [Notice of Shipment ("NOS")], so

when that information come to Sara, so Sara tried to cover herself to not having no NOS and send me that amount of car. So that's why she get Randy to pressure me into unloading those cars." (Doc. 25-3, at 154–55; *see also id.* at 169.) This evidence indicates Johnson was complaining about Ballou's failure to provide paperwork and shifting blame onto Johnson for the shipping calls, not about unlawful discrimination or about any other unlawful practice under Title VII. Although Johnson refers to Ballou as a white female, he does not testify, for example, that she failed to return his calls because he was male, or African-American, or Jamaican-born. A "vague charge of discrimination . . . is insufficient to constitute opposition to an unlawful employment practice." *Willoughby*, 104 F. App'x at 531 (6th Cir. 2004); *see also Booker*, 879 F.2d at 1313.

Ardent Mills next argues that Johnson has not established his *prima facie* case because there is no evidence the decisionmakers were aware of his allegedly protected activity, i.e., his comments about Ballou. (Doc. 53, at 21.) Garvert and Somerville testified that they and Marte made the decision to remove Johnson from his supervisory role. (Doc. 53-2, at 6, 219.) Garvert and Somerville both testified that they were not aware of Johnson's complaints about Ballou when they made the decision. (*Id.* at 6, 219.) Johnson testified that he believes Garvert made the decision and that "the main reason" Garvert decided to remove him from the supervisory position was his complaint to Miller about Ballou. (*Id.* at 77, 89.)[9] The reason Johnson gave for his belief that Garvert was the decisionmaker is that his coworker, Ernesto Rubio, called him

---

[9] In Johnson's response, he states that "[i]t is a disputed fact that Randal Garvert and Mile [sic] Somerville, Director of [H]uman Resources made the decision to offer Johnson a new position." (Doc. 54-3, at 3.) However, this statement is not accompanied by any citation to the record and Johnson testified that he believes Garvert made the decision. (Doc. 53-2, at 77.) Johnson's response does not identify any alternative decisionmakers who did know about Johnson's complaints (Doc. 54-3, at 3), and nothing in the record indicates that anyone other than Miller, Johnson, and possibly Ballou, knew about Johnson's complaints about Ballou prior to the lawsuit. (*Id.* at 89–92.)

18

after Johnson complained to Miller about Ballou and warned him that there was "something coming down the pipe" and that he received his "first write-up" from Halling two or three weeks afterwards. (*Id.* at 77.) Johnson's testimony does not explain, however, why he attributes retaliation to Garvert specifically, and it appears to be speculation based on his belief that Ballou was Garvert's "pet[.]" (*Id.* at 91.) Without more, Johnson's mere speculation that Garvert knew about his complaints to Miller about Ballou does not create a genuine issue of material fact as to whether the decisionmakers were aware of the complaints. Accordingly, Johnson has not established a *prima facie* case for retaliation.[10]

### C. Retaliation Under the TPPA

To establish a *prima facie* case of retaliation under the TPPA, a plaintiff must show that: (1) the plaintiff was as an employee of the defendant; (2) the plaintiff refused to participate in, or to remain silent about, illegal activities; (3) the employer discharged the employee; and (4) there was an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee. *Wooley v. Madison Cty., Tenn.*, 209 F. Supp. 2d 836, 845 (W.D. Tenn. 2002) (citing *Hill v. Perrigo of Tenn.*, No. M2000–02452–COA–R3–CV, 2001 WL 694479, at *3 (Tenn. Ct. App. June 21, 2001)).

As stated in his amended complaint, Johnson asserts "Retaliatory Discharge claims under the TPPA," alleging that he was "discharged on July 22, 2016 due to his refusal to participate in or remain silent about activities against the public good." (Doc. 50, at 14.) In addition to there being no evidence in the record that the concerns he raised about Ballou were related to unlawful

---

[10] As addressed above, even if Johnson had shown he engaged in protected activity, he has not identified any evidence suggesting that reassigning him to another position would have constituted an adverse employment action or that Ardent Mills's reason for doing so was pretext for retaliation.

19

discrimination, as explained above (*supra*, Section III.B), there is no evidence that Johnson's comments about Ballou were related to any alleged illegal activities. (Doc. 53-2, at 11–13.)

And, although McDaniel, Johnson's coworker, believed that he was terminated partly because he voiced safety concerns related to Ardent Mills's vomitoxin policy (Doc. 54-1, at 85), there is no evidence in the record that *Johnson* was reassigned for a related reason; indeed, there is no evidence that Johnson ever made any statements to anyone about vomitoxin levels or other safety concerns or that, in complaining about Ballou's failure to provide the "NOS" paperwork, he was communicating safety-related concerns. (*See* Doc. 25-3, at 154–55). Any safety concerns Johnson may have privately felt or previously mentioned about vomitoxin do not convert his complaints about an interpersonal dispute into protected activity. *Cf. Booker*, 879 F.2d 1304, 1312–13 (6th Cir. 1989). Johnson has not shown that he "refus[ed] to participate in, or to remain silent about, illegal activities." *Id*. Accordingly, Johnson has not established a *prima facie* claim under the TPPA.

IV. **CONCLUSION**

Ardent Mills has satisfied its burden of showing there is no genuine issue of material fact and that as a matter of law it is entitled to a summary judgment on Johnson's claims. For the foregoing reasons, Ardent Mills's motion for summary judgment (Doc. 52) is **GRANTED** as to all claims, and this action will be **DISMISSED WITH PREJUDICE**.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**